1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENITA PALMER, et al., | CASE NO. 1:13-CV-1400 AWI JLT |
| **Plaintiffs** | |
| v. | **ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| SALVADOR VASQUEZ, et al, | |
| **Defendants** | (Doc. No. 47) |

This is civil rights action stems from the death of Ladwright Smith ("Smith") while he was incarcerated with the California Department of Corrections and Rehabilitation ("CDCR"). Plaintiffs are family members of Smith and have brought suit against employees of CDCR who work at the California Correctional Institution ("CCI"):  Correctional Officers Salvador Vasquez ("Vasquez") and Darren Brown ("Brown") and Warden Kim Holland ("Holland").  In the Third Amended Complaint ("TAC"), Plaintiffs bring four claims under 42 U.S.C. § 1983 for violations of the First, Eighth, and Fourteenth Amendments.  Defendants now move for summary judgment on all claims.  For the reasons that follow, Defendants' motion will be granted.

## SUMMARY JUDGMENT FRAMEWORK

Summary judgment is proper when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions

1   of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine

2   issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty

3   Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome

4   of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49

5   (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).  A dispute is "genuine" as to

6   a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-

7   moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d

8   509, 514 (9th Cir. 2010).

9       Where the moving party will have the burden of proof on an issue at trial, the movant must

10   affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.

11   Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an

12   issue at trial, the movant may prevail by presenting evidence that negates an essential element of

13   the non-moving party's claim or by merely pointing out that there is an absence of evidence to

14   support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Herbert

15   Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a moving party

16   fails to carry its burden of production, then "the non-moving party has no obligation to produce

17   anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan

18   Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If the moving party

19   meets its initial burden, the burden then shifts to the opposing party to establish that a genuine

20   issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio

21   Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest

22   upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets

23   forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope

24   Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

25       The opposing party's evidence is to be believed, and all justifiable inferences that may be

26   drawn from the facts placed before the court must be drawn in favor of the opposing party.  See

27   Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899

28   (9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most persuasive

1    inference, a "justifiable inference" must still be rational or reasonable.  See Narayan, 616 F.3d at

2    899.  "If conflicting inferences may be drawn from the facts, the case must go to the jury."  Holly

3    D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1175 (9th Cir. 2003).  Inferences are not drawn out of the

4    air, and it is the opposing party's obligation to produce a factual predicate from which the

5    inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal.

6    2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine

7    issue of material fact does not spring into being simply because a litigant claims that one exists or

8    promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d

9    15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir.

10   2002).  The parties have the obligation to particularly identify material facts, and the court is not

11   required to scour the record in search of a genuine disputed material fact.  Simmons v. Navajo

12   Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010).  Further, a "motion for summary judgment may not be

13   defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"  Anderson,

14   477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the

15   nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the

16   moving party is entitled to summary judgment.  Nissan Fire, 210 F.3d at 1103.

17

18                              **FACTUAL BACKGROUND**[1]

19        Smith was incarcerated by the CDCR beginning on May 5, 2010.  DUMF 1.  Smith was

20   married to Plaintiff Benita Palmer ("Palmer") on May 23, 2003.  DUMF 2.  Plaintiff Nicole

21   Palmer ("Nicole") is the adult daughter of Palmer, and is Smith's step-daughter.  DUMF 3.

22   Plaintiff Christian Smith ("Christian") is the adult biological child of Smith.  DUMF 5.  Plaintiff

23   Keshawn Winston ("Winston") is the son of Palmer and third-party James Winston.  DUMF 6.

24   After Smith was incarcerated by CDCR in 2010, he did not provide any financial support for

25   Winston or Nicole.  See DUMF's 4, 7.

26        Smith had been affiliated with the Avalon Crips gang, and his nickname in the gang was

27

28   _____

     [1] "DUMF" refers to "Defendant's Undisputed Material Fact," and "PUMF" refers to "Plaintiff's Undisputed Material
     Fact."

1   "Snoop."  DUMF 8.  Smith had a prior conviction for manslaughter.  DUMF 9.  Smith had

2   received a 14-month term in the Security Housing Unit ("SHU") for battery on an inmate with a

3   weapon, effective February 28, 2012.  See DUMF 10; PUMF's 7, 8.  Smith was later placed on

4   double-cell status on June 6, 2012, with Holland's approval.  See DUMF 11; PUMF's 9, 63.

5        Inmate Anthony Taylor was received by CDCR on September 21, 2007, after being

6   convicted of first degree murder.  DUMF 12.  Taylor had been affiliated with the Crips gang.

7   DUMF 13.  From April 6, 2003 to May 9, 2012, Taylor had been involved in approximately 12

8   violent incidents with non-cellmate inmates.[2]  See PUMF's 31, 41; Defendants' Ex. F.  Taylor had

9   been involved in incidents of in-cell violence on March 22, 2008,[3] July 7, 2008, and December 2,

10  2010.  See DUMF 14; PUMF's 34, 40.  Taylor had been placed on single-cell status in January

11  2009 and January 2011.  See PUMF's 21, 29; Plaintiffs' Ex. 41.

12       During an Institutional Classification Committee:  Administrative Segregation Unit

13  ("ASU") Program Review on October 13, 2011, Taylor's housing status was changed from single-

14  cell status to double-cell status, after Taylor had requested a cellmate.  DUMF 15.  During an

15  Initial General Population Review at Salinas Valley State Prison ("SVSP") on November 1, 2011,

16  Taylor was cleared for double-cell status.  DUMF 16.

17       On April 18, 2012, Taylor was placed in the ASU at SVSP following an incident involving

18  battery on another inmate at a recreation yard.  See DUMF 17.  Because a review of Taylor's

19  central file did not reflect a pervasive pattern of in-cell violence or predatory behavior towards

20  cellmates, SVSP personnel continued Taylor on double-cell status after April 26, 2012.  See

21  DUMF 18.  During a Program Review on May 24, 2012, SVSP personnel determined that Taylor

22  did not have a history of in-cell violence or sexually predatory behavior towards cellmates and

23  again approved him for double-cell housing.  See DUMF 19.

---

[2] The relevant dates are:  April 6, 2003, March 3, 2005, July 25, 2005, September 2 and 4, 2005, September 7, 2006, December 25, 2007, October 18, 2007, February 14, 2008, April 18, 2008, December 13, 2009, and May 9, 2012.  See PUMF's 31, 41; Defendants' Ex. F.

[3] DUMF 14 indicates that Taylor had engaged in in-cell violence on March 10, 2010.  However, CDCR documentation indicates that the correct date is actually March 10, 2008.  See Plaintiffs' Ex. 37.  The document relied upon by Defendants is Exhibit F, which lists disciplinary history in descending chronological order.  While March 22, 2010 is listed, it is listed between an April 2008 event and an October 2007 event.  The Court will view the evidence as showing that Taylor engaged in in-cell violence on March 10, 2008, not March 10, 2010.  See Plaintiffs' Ex. 37.

Taylor arrived at CCI on July 13, 2012, and Sgt. Campbell conducted an Initial Housing Review and determined that Taylor was cleared for double-cell status. DUMF 23. Campbell reviewed Taylor's Central File and did not find any information concerning incidents which had occurred after May 24, 2012 (the date Taylor had last been cleared for double-cell status at SVSP), which would cause Taylor to be placed on single-cell status at CCI. See DUMF 24. However, as part of the Initial Housing Review, documentation noted Taylor as having been aggressive towards staff and inmates and having used a weapon in the past. See PUMF 43. Campbell interviewed Taylor, but did not uncover any information during the interview which indicated that Taylor was likely to threaten or harm a cellmate. DUMF 25. Taylor was then placed in a cell with inmate Brown. DUMF 26.

On July 14, 2012, Taylor notified correctional staff that he wanted to get another cellmate because inmate Brown talked too much and Taylor could not get any sleep. DUMF 27. This statement was interpreted by CCI staff as a request to be moved, not a threat. DUMF 28. Smith and Taylor were considered potential cellmates because both were members of the Crip Security Threat Group, and because Smith was housed in 4A-209U without a cellmate. DUMF 29.

Taylor's Central File and Smith's Central File were reviewed by Sgt. Kirby on July 14, 2012, and Taylor was approved to be housed with Smith by a lieutenant. DUMF 30. Before Taylor and Smith were allowed to be housed together, they were able to meet together and speak to each other while housed in a holding cell, in order to make sure that they were compatible and could live together. DUMF 31. The meeting lasted between 5 and 10 minutes. See PUMF 46. That day, Smith and Taylor signed a CDC 1882-B form representing that they both requested to be assigned to the same cell, agreed to be assigned to the same cell, and were compatible cellmates. DUMF 32. Smith and Taylor were assigned to cell 209 in Facility A, Housing Unit 4, Section A, which is a SHU.[4] See DUMF's 45, 55. Brown, Vasquez, and Holland did not assign Smith and Taylor to a double-cell and were not involved in the decision to do so.[5] See DUMF's 36, 70, 71.

---

[4] In order to be housed in a SHU, a prisoner's behavior reflects the need for a higher custody level and higher level of supervision. See PUMF 59.

[5] Some of the cells in Facility A Housing Unit 4 had two prisoners in them, and other cells did not. See PUMF 55. However, because of space, prisoners in the SHU are expected to have a cellmate. See PUMF 58.

Taylor's Central File did not contain any CDC 128 Chronos referring to psychological concerns which would affect his housing status.  DUMF 34.  The review of the Central Files of Smith and Taylor did not uncover any reasons why these inmates would not be compatible cellmates, as both inmates had violent pasts, were members of the same prison gang, both had been cleared for double-cell status, and both inmates had stated that they were compatible as cellmates.  DUMF 35.  In determining whether to house inmates together, correctional officers do not have access to the inmate's mental health records.  DUMF 33.[6]  The existence of any prison over-crowding was not a factor in determining whether Smith and Taylor could be housed together; rather the decision to place Smith and Taylor together was based on whether Smith and Taylor should be double-celled under CDCR policies.  DUMF 38.

On July 15, 2012, Facility A, Housing Unit 4, was a SHU, and a Correctional Sergeant, two Floor Officers, and a Search and Escort Officer were assigned to this housing unit, working under the supervision of a Correctional Lieutenant.  DUMF 45.  Housing Unit 4 consists of three sections, A, B, and C.  DUMF 47.

On July 15, 2012, Vasquez was employed as a Search and Escort officer at Facility A, Housing Unit 4, and was responsible for covering the housing unit for inmate counts, feeding inmates, running paperwork to other housing units, and escorting inmates in and out of the housing unit.  DUMF 46.  Vasquez arrived for duty at CCI at 2:00 p.m. and along with two other

---

[6] Plaintiffs dispute DUMF 33 by citing the declaration of E. Myers, who is a Health Records Technician and the custodian of records for inmates at CDCR.  See Plaintiff's Ex. 59.  Myers declares that a medical file is maintained on each inmate in CDCR, the medical file is maintained by the medical department of the institution housing the inmate, the medical file is transferred when the inmate is transferred to other institutions, and documents relating to medical exams and treatment are maintained in the medical file.  See id.  Myers's declaration does not genuinely dispute DUMF 33.  The CCI correctional officers review an inmate's Central File in making housing determinations.  See Holland Dec. ¶ 12.  There is no evidence that the medical file is part of an inmate's Central File.  Furthermore, Myers simply describes the existence of a medical file and the file's contents.  Myers does not indicate that correctional officers review or have access to the medical files as part of housing decisions.  That a medical file exists for an inmate does not mean that all prison personnel have access to it.  This is especially true in light of Holland and two correctional sergeants (the two who were involved in housing Taylor) declaring that correctional officers do not have access.  See Campbell Dec. ¶ 7; Holland Dec. ¶ 12; Kirby Dec. ¶ 7; Nouwels Dep. 4:3-10.  Instead, if there is a mental health issue that could affect an inmate's housing status, mental health staff inform correctional staff and place a 128 Chrono in the inmate's Central File.  See Campbell Dec. ¶ 7; Kirby Dec. ¶ 7.  DUMF 33 is undisputed.

Relatedly, Plaintiff cites mental health records regarding Smith and Taylor.  Because it appears that neither Defendants nor the personnel who made the housing decisions with respect to Taylor and Smith had access to mental health records, see Campbell Dec. ¶ 7; Holland Dec. ¶ 12; Kirby Dec. ¶ 7, the information in those records would not have been reviewed.  Therefore, Smith and Taylor's health records are irrelevant and will not be considered in this motion.

1  officers began the process of providing showers for inmates.  See DUMF's 48, 49.  Between 2:00

2  and 3:00 p.m., showers were provided for inmates in sections A, B, and C by Vasquez and the two

3  other officers before the evening meal was served.  DUMF 50.  Correctional officers check on the

4  inmate's welfare while conducting the shower process, observing the inmates as the inmates

5  respond to whether they wish to shower at that time.  DUMF 51.  The process for providing

6  showers to inmates can be interrupted by other activities, such as escorting inmates or providing

7  the evening meal.  DUMF 52.

8       The trays for the inmates' evening meal usually arrive between 4:30 p.m. and 5:30 p.m.,

9  and inmates are fed the evening meal inside their cells.  DUMF's 53, 54.  On July 15, 2012 at 3:15

10  p.m., Vasquez and Rivera were serving the evening meal (which had arrived early) when they

11  approached Smith and Taylor's cell.  See DUMF 55.  Vasquez observed Smith lying on the

12  ground with a cloth on his face and blood on the floor and wall.  Id.  Vasquez called Smith's

13  name, but Smith did not respond, so Vasquez notified another officer who called a medical

14  emergency on the CCI radio.  See DUMF 56.  No blood was observed on Taylor, who was on the

15  top bunk, reading a book.  DUMF 57.  Vasquez then ordered Taylor to submit to handcuffs and

16  removed Taylor from the area, placing Taylor in a holding cell.  DUMF 58.

17       Brown was working in Facility A, Housing Unit 2 between 2:00 p.m. and 10:00 p.m. on

18  July 15, 2012.  See DUMF 59.  At approximately 3:15, while in Housing Unit 2, Brown heard an

19  emergency medical call over the CCI radio from Housing Unit 4 (which is a separate building

20  from Unit 2) and responded to the call.  DUMF 60.  Brown did not have any job responsibilities in

21  Housing Unit 4, and had not entered Housing Unit 4 prior to receiving the emergency radio call.

22  See DUMF 61.  After arriving at Housing Unit 4, Brown put on an extraction helmet and

23  examination gloves and proceeded to cell 209.  See DUMF 62.  Brown observed Taylor inside the

24  cell with hand restraints on and with his back facing the cell door.  See id.  After the cell door

25  opened and Taylor was escorted from the cell, Brown followed a shield officer into the cell and

26  observed Smith lying flat on his back, with his head touching the cell wall and wrapped in

27  multiple t-shirts.  See DUMF  63.  Brown grabbed Smith's legs and, with help from other officers,

28  pulled Smith out of the cell, so that medical staff members could administer first aid and CPR.

1  See DUMF 64.  Brown then assisted in placing Smith on his back on a litter.  See DUMF 65.

2  Medical staff continued to administer CPR, and Brown helped carry Smith down the stairs so that

3  Smith could be placed on a gurney.  See id.  Brown then pushed the gurney to the clinic while

4  medical staff continued performing CPR.  See id.  Once inside the clinic, Brown assisted staff in

5  lifting Smith onto a medical table, after which medical staff continued CPR.  DUMF 66.  Before

6  Brown heard the emergency call, he did not have an opportunity to intervene to prevent harm from

7  occurring to Smith.  DUMF 67.

8      At 3:40 p.m., ambulance and fire personnel arrived at the medical clinic.  See DUMF 68.

9  A doctor from Kern Medical Center was summoned, and the doctor pronounced Smith dead at

10  3:42 p.m.  See id.  The Kern County Sheriff/Coroner was unable to determine a time of injury.

11  DUMF 69.

12      Holland was not present at CCI on July 15, 2012.  DUMF 72.  As the warden of CCI,

13  Holland was not involved in making the decision to house Taylor with Smith.  DUMF 36.

14  Holland did not participate in any classification committees prior to July 15, 2012, because Taylor

15  arrived at CCI on Friday, July 13, 2012, was housed at 6:43 p.m. after normal business hours, and

16  the next classification committee could not occur prior to Monday July 16, 2012.  DUMF 37.  The

17  sergeants involved in Taylor and Smith's housing decision had been trained as to how to conduct

18  Initial Housing Reviews of inmates, determining whether an inmate is or is not cleared for double-

19  cell status, and whether inmates were compatible as cellmates.  See DUMF 39.  Holland was

20  responsible for the overall operation of CCI, but had delegated responsibility of supervision of

21  correctional staff to ensure compliance with CDCR policies and procedures to Chief Deputy

22  Wardens, Associate Wardens, and the Facility Captains who were assigned to each of the five

23  separate facilities at CCI; if informed by a Facility Captain or Correctional Lieutenant that CDCR

24  policies were not being followed, Holland would take appropriate action.  DUMF 40.  In 2012,

25  Holland understood that at least four inmate counts, including one standing count, took place each

26  day, along with welfare checks which took place every half hour on a random basis, in order to

27  ensure the inmates' well-being; Holland had no knowledge that these procedures were not being

28  followed.  DUMF 41.  Vasquez testified that the half-hour welfare checks began after the death of

1  Smith.  See PUMF 61.  In 2012, all correctional staff were required to complete annual training in

2  a number of fields (including first aid), and Holland delegated responsibility to ensure that all

3  correctional staff at CCI had completed required training to In-Service Training Manager, who

4  tracked all training at CCI, and, on behalf of Holland, would contact either the responsible Facility

5  Captain or Correctional Lieutenant if a particular employee had not completed required training.

6  DUMF 42.  As of July 15, 2012, Holland had no knowledge that CDCR policies and procedures,

7  and local Operational Procedures concerning Inmate Housing Assignments, were not being

8  followed.  DUMF 43.

9       In 2012, CDCR policy expected that inmates would double-cell, whether housed in a

10  Reception Center, General Population, ASU, or SHU, if it was determined that the inmate was

11  suitable for double-cell status.  DUMF 20.  CDCR policy provided that single-cell status shall be

12  considered for those inmates who demonstrate a history of in-cell abuse, significant in-cell

13  violence towards a cell partner, verification of predatory behavior towards a cell partner, or who

14  have been victimized in-cell by another inmate.  DUMF 21.  In considering single-cell status,

15  CDCR staff shall consider the inmate's pattern of behavior, not just an isolated incident.  Id.

16  Also in 2012, CCI Local Operational Procedure 113 - Inmate Housing Assignments - was

17  intended to assign inmates to the proper housing status upon arrival and subsequent classification

18  reviews, during which an Initial Housing Review would be conducted that was based on a review

19  of information from an intake sheet, the Central File, and an interview with the inmate, in order to

20  determine if an inmate would be double-celled or if an inmate required single-cell status.  DUMF

21  22.  For inmates assigned to the ASU or the SHU, assignments would be approved by a

22  Correctional Lieutenant after a review of documentation relative to the inmate's safety and status

23  which could impact his ability to be double-celled or to require single-cell status, including CDC-

24  128B informational Chronos, CDC 804 forms referring to a pending rule violation, including in-

25  cell incidents involving battery on an inmate, CDC 128-G Classification Chronos, CDC 114D

26  forms, confidential information contained in the Central File, and CDC 812, 812A, 812B, and 812

27  C critical case forms concerning inmates designated as "enemies" of an inmate.  Id.  All inmates,

28  unless approved for single-cell status, were expected to have a cellmate.  Id.

1    Overall staffing levels at CCI were determined by CDCR staff employed at CDCR

2 headquarters, not Holland, based on the design of the institution, the programs conducted at the

3 institution, the number of inmates housed at the institution, and the classification scores of the

4 inmates housed at the institution.  DUMF 44.

5

6                              **DEFENDANT'S MOTION**

7    **A.**      **Standing Of Nicole & Winston**

8    *Parties' Arguments*

9    Defendants argue that Nicole and Winston cannot maintain a wrongful death claim against

10 Defendants because they were not dependent upon Smith, as required by California Code of Civil

11 Procedure § 377.60.  Plaintiffs argue that § 377.60 does not apply because Nicole and Winston's

12 claims are based on their own personal constitutional right to familial association with Smith.

13    *Discussion*

14    Citing *Moreland v. Las Vegas Metro. Police Dept.*, 159 F.3d 365, 369 (9th Cir. 1998),

15 Defendants state that a survivor can bring a "wrongful death action" under § 1983 if authorized by

16 state law.  However, this is not precisely what *Moreland* holds.  *Moreland* actually holds that a

17 survivor may bring a "survival action," i.e. an action asserting a claim on behalf of the decedent, if

18 authorized by the relevant state.  Moreland, 159 F.3d at 369; see Hayes v. County of San Diego,

19 736 F.3d 1223, 1228-29 (9th Cir. 2014).  Plaintiffs have clarified that Nicole and Winston are

20 bringing a claim based on their own personal constitutional rights, and that they are not bringing a

21 claim on behalf of Smith or based on Smith's personal rights.  With this clarification, *Moreland*'s

22 discussion of survival actions has no application to Nicole and Winston.[7]

23    The right to familial associate is guaranteed by the federal Constitution.  See Lee v. City of

24 Los Angeles, 250 F.3d 668, 685 (9th Cir. 2001).  The right to familial association may be violated

25 through the death of a family member or some type of separation of a family member by a person

26 acting under color of law.  See, e.g. Hayes, 736 F.3d at 1230 (evaluating familial association claim

27

28 [7] The Court notes that to bring a survival cause of action, the requirements of California Code of Civil Procedure § 377.30, not § 377.60, must be met.  Hayes, 736 F.3d at 1229.

involving the death of a child's father); Crowe v. County of San Diego, 608 F.3d 406, 417 (9th

Cir. 2010) (evaluating familial association claim involving the arrest of a child).  The ability to

vindicate one's own federal constitutional right to familial association is dependent upon the

requirements of § 1983, see Lee, 250 F.3d at 685, it is not dependent on state law.  Cf.  Hayes, 736

F.3d at 1229-30 (discussing requirements of § 377.30 to bring a survival cause of action, and later

analyzing a familial association claim without any reference to or discussion of § 377.30 or §

377.60).  Because Nicole and Winston are alleging violations of their own federal constitutional

rights, § 377.60 has no application.

Summary judgment against Nicole and Winston based on the failure to meet the

requirements of § 377.60 is inappropriate.

**B.      Claims Against Holland**

*Defendants' Argument*

Defendants argue that Holland was not physically present on July 15 and was not involved

in the decision to house Smith and Taylor together.  Smith and Taylor were housed together after

both had been cleared for double-cell status because there was no demonstrated history of in-cell

abuse, in-cell violence towards a cellmate, or verification of predatory behavior towards a

cellmate.  Smith and Taylor were not housed together because of overcrowding, but because

CDCR policy required inmates to be double-celled unless an inmate qualified for single-cell

status.  In addition to CDCR policy, Holland instituted a local Operational Procedure that required

an Initial Housing Review in order to determine an inmate's cell status.  A sergeant reviewed the

Central Files of Smith and Taylor and determined that the two could be housed together.  This

conclusion was consistent with housing determinations by SVSP in November 2011, April 2012,

and May 2012, because Taylor did not have a recent history of in-cell violence.  The last incident

of in-cell violence by Taylor occurred on December 10, 2010, over one and a half years prior to

the July 15, 2012 incident with Smith.  Holland hired In-Service Training Manager to ensure that

all staff at CCI had completed required training, and the sergeants who reviewed Smith and

Taylor's files had been trained how to conduct housing reviews and determine cell status.  Holland

ensured that employees received necessary training, and understood that policies regarding inmate

1  housing, as well as policies regarding inmate counts and welfare checks, were being followed.

2  Holland was unaware that any CDCR policies were not being followed.  Had she been aware, she

3  would have ensured that discipline and/or additional training would have been implemented.

4  *Plaintiffs' Opposition*

5        Plaintiffs argue that Title 15 of the California Code of Regulations makes clear that

6  wardens are responsible for the custody, treatment, training and discipline of all inmates in the

7  warden's charge.  Title 15 requires a warden to ensure that each employee be trained to understand

8  how the physical facilities, degree of custody classification, personnel, and operative procedures

9  affect inmate custody and security.  Title 15 explains that custodial, staff, inmate, and public

10 security are to take precedence over all other operations of an institution.  Title 15 also imposes a

11 requirement that an inmate count be taken at least four times a day, and that no other inmate

12 activity be scheduled at a time that would disrupt a count.   Holland admits that that CDCR policy

13 required staff to conduct 4 inmate counts, and admits that CCI policy required random welfare

14 checks every half-hour in Facility A.  However, Vasquez testified that conducting welfare checks

15 every half hour only began after Smith's death.  Further, Vasquez and Brown came on duty at 2:00

16 p.m., but they did not conduct any kind of welfare check on prisoners in Facility A, but instead

17 continued taking prisoners to showers.  Holland declared that she had no knowledge that the

18 inmate counts and the half-hour welfare checks were not occurring in Facility A, but that if she

19 had known, she would have ordered corrective action.  A supervisor may be liable for his or her

20 own inaction.  Thus, by admitting that the welfare of inmates in the SHU was not being monitored

21 and that she was ignorant of that fact, Holland admitted liability under § 1983.

22       Plaintiffs also argue that Title 15 explains that a SHU is designed for prisoners who are a

23 danger to others or to the security of the institution.  Despite knowing the nature of a SHU,

24 Holland personally approved Smith for a double-cell in the SHU and knew that Smith would be

25 housed with another prisoner who was classified as a threat to others or the security of the

26 institution.  Had Holland not approved Smith for double-cell status, Smith would not have been

27 attacked.  Thus, Holland set in motion a series of events that led to Smith's death.

28       Furthermore, the level of monitoring of SHU inmates reflects deliberate indifference.

Despite the security risk posed by SHU inmates, the four inmate counts and various welfare checks would give inmates 5 plus hours to assault a cellmate.  This level of monitoring, and opportunity for cellmate assaults, reflects deliberate indifference by Holland.

*Legal Standards*

1.   Supervisory Liaiblity

Under 42 U.S.C. § 1983, "supervisory officials are not liable for actions of subordinates on any theory of vicarious liability."  Jeffers v. Gomez, 267 F.3d 895, 915 (9th Cir. 2001); Hansen v. Black, 885 F.2d 642, 645-46 (9th Cir. 1989).  Rather, a "supervisor may be liable under § 1983 only if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  Jeffers, 267 F.3d at 915; Hansen, 885 F.2d at 646.  "The requisite causal connection may be established when an official sets in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict constitutional harms."  Corales v. Bennett, 567 F.3d 554, 570 (9th Cir. 2009); Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).  "Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiesce[nce] in the constitutional deprivations of which [the] complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others."  Corales, 567 F.3d at 570; Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991).  If a subordinate officer's actions do not violate the Constitution, then the supervisor will not be liable.  See Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998).

2.   Eighth Amendment – Failure to Protect

"The Eighth Amendment imposes a duty on prison officials to protect inmates from violence at the hands of other inmates."  Cortez v. Skol, 776 F.3d 1046, 1050 (9th Cir. 2015); Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005).  However, not every injury suffered by one prisoner at the hands of another violates the duty to protect, rather, liability under the Eighth Amendment attaches only if a prison official was "deliberately indifferent" to "'conditions posing a substantial risk of serious harm' to an inmate."  Clem v. Lomeli, 566 F.3d 1177, 1181 (9th Cir.

2009).  To be "deliberately indifferent" to a risk of serious harm, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Cortez, 776 F.3d at 1050; Labatad v. Corr. Corp. of Am., 714 F.3d 1155, 1160 (9th Cir. 2013).  A prison official violates the duty to protect when two requirements are met:  (1) objectively viewed, the prison official's act or omission must cause "a substantial risk of serious harm," and (2) the official must be subjectively aware of that risk and act with "deliberate indifference to inmate health or safety."  Cortez, 776 F.3d at 1050; see Hearns, 413 F.3d at 1040.  Therefore, "[l]iability may follow only if a prison official knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Labatad, 714 F.3d at 1160.

### Discussion

Holland was not present at Taylor's arrival at CCI, she did not participate in the decision to grant Taylor double-cell status, she did not participate in the decision to house Smith with Taylor, and there is no evidence that she directed that Taylor be housed with Smith.  See DUMF's 36, 37, 72.  Holland was aware of the local policy at CCI for a housing review of all inmates in order to determine an inmate's cell status.  See DUMF 22; Holland Dec. ¶¶ 10, 11.  Plaintiffs do not demonstrate how this policy was deliberately indifferent to Smith's rights.  Holland also took steps to ensure that personnel were trained with respect to housing reviews and the criteria for double-cell and single-cell status.  See DUMF 42; Holland Dec. ¶ 9.  The sergeants who were involved with classifying Taylor and with housing Smith and Taylor together had received the appropriate training.  See DUMF 39.  Plaintiffs do not identify any deficiencies in the training, nor do Plaintiffs specify how the decision to house Smith with Taylor violated training.[8]  The steps Holland took to ensure that CCI personnel were trained regarding housing and cell status does not indicate deliberate indifference.  Assuming that the CCI personnel involved in housing Smith and Taylor together somehow failed to follow their training, that single instance does not show a deliberately indifferent training regime.  Cf. City of Canton v. Harris, 489 U.S. 378, 391 (1989)

---

[8] Holland declares that she was unaware that housing policies and procedures were not being followed.  See Holland Dec. ¶ 13.  However, no violation of policy or procedure is actually identified by Holland or any party.

1   ("[A]dequately trained officers occasionally make mistakes; the fact that they do says little about

2   the training program . . . ."). Additionally, Holland has declared that she was unaware of any

3   violations of housing and cell status procedures by staff.  See Holland Dec. ¶ 13. Plaintiffs cite no

4   contrary evidence. Subjective awareness of a substantial risk of serious harm is necessary to show

5   deliberate indifference and a violation of the Eighth Amendment. Farmer v. Brennan, 511 U.S.

6   825, 837 (1994); Cortez, 776 F.3d at 1050. Because Holland was unaware of any violations of the

7   housing and cell status policy (if any existed), she could not have been deliberately indifferent. Id.

8           Plaintiffs argue that those housed in the SHU are considered a danger to other inmates or

9   to institutional safety, and thus, housing these inmates together constitutes deliberate indifference.

10  The Court is not convinced. First, Holland has not imposed a policy of double-celling SHU

11  inmates that is unique to CCI, rather it is a policy that is mandated by state regulation. Title 15

12  Section 3269 states that it is expected that all inmates, including those inmates in a SHU, double-

13  cell, and that if the criteria for double-cell status is met, an inmate will face discipline for refusing

14  a double-cell assignment. 15 C.C.R. § 3269 & (c). Second, an inmate can be a danger to other

15  inmates or to institutional safety for a number of reasons. Because of this, there are criteria in

16  place for determining whether an inmate should be given a double-cell or a single-cell status.

17  Single-cell status is to "be considered for those inmates who demonstrate a history of in-cell

18  abuse, significant in-cell violence towards a cell partner, verification of predatory behavior

19  towards a cell partner, or who have been victimized in-cell by another inmate." 15 C.C.R. §

20  3269(d). Personnel are to consider attempts at predatory behavior, documented instances of being

21  a victim, and other relevant considerations in determining single-cell status. See id. This criteria,

22  as well as the reason why an inmate is placed in a SHU, are to be considered in determining a

23  SHU inmate's cell status. See 15 C.C.R. § 3269(c). Thus, § 3269 mandates an individualized

24  assessment of each inmate in order to determine the proper housing status. If an inmate's history

25  or other considerations show the need for single-cell status, he will be given that status despite the

26  general expectation of double-celling. See 15 C.C.R. § 3269(e). Although inmates have a

27  constitutional right to be protected from violence by other inmates, see Cortez, 776 F.3d at 1050, it

28  is not per se unconstitutional to double-cell inmates. See Rhodes v. Chapman, 452 U.S. 337, 341,

348-50 (1981) (holding double-celling inmates in a 63-square-foot cell is not unconstitutional); Bell v. Wolfish, 441 U.S. 520, 542 (1979) ("We disagree . . . that there is some sort of "one man, one cell" principle lurking in the Due Process Clause of the Fifth Amendment."); Smith v. Marshall, 2013 U.S. Dist. LEXIS 76218, 4-5 (C.D. Cal. Mar. 18, 2013); Mitchell v. Dodrill, 696 F.Supp.2d 454, 468 (M.D.Pa. 2010).  Because of the individualized assessment required for a SHU inmate's housing status, a policy of generally permitting double-cell status for SHU inmates is not deliberately indifferent or a per se violation of the Eighth Amendment.  Cf. id.

Plaintiffs also emphasize that Vasquez and Brown did not conduct any welfare checks when their shifts began at 2:00 p.m. on July 15, and that welfare checks were not being conducted randomly every half hour.  These facts do not create liability as to Holland.  Brown was not even working in Smith and Taylor's building, so Brown's actions could not have possibly harmed Smith or formed a basis for Holland's liability.  See DUMF's 59, 60, 61; Waktkins, 143 F.3d at 1093.  As for Vasquez, that he may have done something wrong does not alone mean that Holland would be liable, as there is no vicarious liability under 42 U.S.C. § 1983.  See Castro v. County of L.A., 785 F.3d 336, 448 (9th Cir. 2015); Jeffers, 267 F.3d at 915.  Moreover, as discussed below, there is no evidence that Vasquez's failure to perform a welfare check between 2:00 p.m. and 3:15 p.m. violated the Eighth Amendment.  Assuming that internal CCI policy required Vasquez to perform a welfare check between 2:00 p.m. and 3:15 p.m., a violation of a departmental policy or regulation does not establish a constitutional violation.  See Cousins v. Lockyer, 568 F.3d 1063, 1070 (9th Cir. 2009); Case v. Kitsap County Sheriff's Dep't, 249 F.3d 921, 930 (9th Cir. 2001).  Because Vasquez did not constitutionally harm Smith, there is no supervisory liability against Holland relative to Vasquez's actions.  See Watkins, 145 F.3d at 1093.

In addition to CCI staff failing to perform random welfare checks, Plaintiff also cites several provisions from Title 15 of the California Code of Regulations that impose duties on wardens to ensure proper training for staff and proper security for prisoners, including mandatory head counts.[9]  Plaintiffs' argument is not persuasive.  First, assuming that the absence of random

---

[9] Although Vasquez's testimony indicates that the random welfare checks were not occurring, there is no evidence that specifically states that the 4 daily head counts also were not occurring.

1   welfare checks represents an objectively serious risk of danger to inmates, the evidence is

2   undisputed that Holland was not aware that the welfare checks were not occurring.  Deliberate

3   indifference under the Eighth Amendment requires actual subjective awareness of a substantial

4   risk of danger by a prison official.  See Farmer, 511 U.S. at 837; Cortez, 776 F.3d at 1050.

5   Because Holland did not know that the welfare checks were not happening, she was not

6   deliberately indifferent and thus, did not violate the Eighth Amendment.  See id.  Second,

7   Plaintiffs do not tie the duties under Title 15 to any corresponding constitutional duties.  "To the

8   extent that the violation of a state law amounts to the deprivation of a state-created interest that

9   reaches beyond that guaranteed by the federal Constitution, § 1983 offers no redress."  Sweaney v.

10  Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997).  Violations of a state law or regulation,

11  such as the sections of Title 15 identified by Plaintiffs, do not establish a federal constitutional

12  violation.  Cousins, 568 F.3d at 1070; Case, 249 F.3d at 930; see also Sweaney, 119 F.3d at 1391.

13      Plaintiffs also argue that Holland personally approved Smith for double-cell status in June

14  2012.  Defendants correctly contend that this appears to be a new theory of liability that is not

15  fairly reflected in the TAC.  The TAC does not allege that Smith was incorrectly or improperly

16  given a double-cell status.  Rather, the TAC's allegations focus on the decision to house Taylor

17  with Smith and on the failure to protect Smith from Taylor.  See TAC ¶¶ 6, 23, 28, 31-34, 36.

18  There is no fair indication in the TAC that Holland's decision to approve Smith for double-cell

19  status would be a basis for liability under § 1983.  Because Holland's decision to approve Smith

20  for double-cell status is a new theory of liability, it will not defeat summary judgment.  See Fossen

21  v. Blue Cross & Blue Shield of Mont., 660 F.3d 1102, 1115 (9th Cir. 2011); Navajo Nation v.

22  United States Forest Serv., 535 F.3d 1058, 1080 (9th Cir. 2008).  Nevertheless, even if a claim

23  based on Holland's decision to approve Smith for double-cell status was fairly reflected in the

24  TAC, there is no evidence that indicates Holland's decision was deliberately indifferent.  Plaintiffs

25  have not shown that Smith had previously been victimized or that he somehow fit within the

26  criteria for single-cell status.  Smith's disciplinary history did not appear to be extensive, and his

27  disciplinary history did not involve violence or abuse against cellmates.  As discussed above,

28  simply because Smith was in a SHU does not mean that the Constitution required he be given

single-cell status.  Without evidence that Holland was subjectively aware of a substantial risk of serious danger to Smith by approving a double-cell status for him, Holland's decision was not deliberately indifferent and did not violate the Eighth Amendment.  See Farmer, 511 U.S. at 837; Cortez, 776 F.3d at 1050.

Finally, as for Plaintiffs' First and Fourteenth Amendment loss of companionship claims, this claim is based on the alleged deliberate indifference to Smith's safety and failing to train and supervise.[10]  See TAC ¶ 53.  In other words, this claim is dependent upon Holland violating Smith's Eighth Amendment rights.  As discussed above, Plaintiffs have not identified any conduct by Holland that was deliberately indifferent to Smith's rights and safety.  Because Plaintiffs' Eighth Amendment claims against Holland fail, their Fourteenth Amendment claims fail as well.

In sum, the evidence shows that Holland took actions to ensure that personnel received appropriate training, believed that staff were following policies and procedures, and was unaware of any failure by staff to comply with their training or CCI and CDCR policy.  Holland's conduct and lack of knowledge do not meet the requirements for deliberate indifference.  See Farmer, 511 U.S. at 837; Cortez, 776 F.3d at 1050.  Also, because Holland did not violate Smith's Eighth Amendment rights, she also did not violate Plaintiffs' Fourteenth Amendment rights to familial association.  Therefore, summary judgment in favor of Holland is appropriate.[11]

**C.   Claims Against Brown**

*Parties' Arguments*

Defendants argue that Brown was not involved in the decision to double-cell Smith with Taylor, and he was assigned to Housing Unit 2 on July 15, 2012.  Housing Unit 2 is a separate building from Housing Unit 4.  Brown had no realistic opportunity to intercede or protect Smith.

Plaintiffs do not address these arguments or expressly discuss Brown's liability.

---

[10] The TAC alleges a violation of the First and Fourteenth Amendments.  See TAC at p.15.  Plaintiffs' opposition states that the Fourteenth Amendment governs their familial association claims.  See Doc. No. 50 at 20:28-21:2.  In light of this clarification, the Court will limit Plaintiffs' claims as being brought under the Fourteenth Amendment.  However, the Court notes that the Ninth Circuit has recognized that both the First and Fourteenth Amendments protect familial rights.  See Lee, 250 F.3d at 685.

[11] Plaintiffs mention space considerations and overcrowding as a reason why Smith was housed with Taylor.  However, Smith was not housed with Taylor due to overcrowding.  Smith and Taylor were housed together because staff determined that they did not meet the criteria for single-cell status.  See DUMF's 11, 22, 24, 25, 29, 30, 31, 32.

*Discussion*

Plaintiffs do not respond to any of Defendants' arguments regarding Brown.  For this reason alone, summary judgment in favor of Brown is proper.  See Ramirez v. City of Buena Park, 560 F.3d 1012, 1026 (9th Cir. 2009) (holding that a party abandons an issue by failing to address it in opposition to summary judgment).  Beyond this shortcoming, if a defendant does not personally participate in, or direct a violation of, a constitutional right, there is no liability under § 1983. James v. Rowlands, 606 F.3d 646, 653 n.3 (9th Cir. 2010).  Here, the undisputed evidence shows that Brown worked in a separate building from where Smith and Taylor were housed, had no opportunity whatsoever to intervene to protect Smith, and had nothing to do with the decision to place Smith and Taylor in the same cell.  See DUMF's 59, 60, 61, 62, 70.  Because there is no evidence that shows Brown personally participated in or directed any constitutional violations, he cannot be liable under § 1983.  James, 606 F.3d at 653 n.3.  Summary judgment in favor of Brown on all claims is appropriate.

**D.     Claims Against Vasquez**

*Defendant's Argument*

Defendants argue that Vasquez was not involved in the decision to house Smith with Taylor, and he was unaware of any facts that would indicate that Taylor would attack Smith. Further, Vasquez had no realistic opportunity to protect Smith from Taylor because when he began his shift, Vasquez started the showering process for the inmates.  It was only when Vasquez brought the early evening meal to Smith and Taylor's cell that he discovered Smith.  Also, although prison policy required random welfare checks, and Vasquez had not performed such a check, violation of a prison policy is not a basis for a § 1983 claim.  Finally, there is no evidence about when the attack on Smith occurred or whether it even occurred while Vasquez was on duty.

*Plaintiff's Opposition*

Plaintiffs argue that Vasquez did not begin his shift by conducting a welfare check of the inmates, but instead continued the prior shift's shower duties.  Vasquez only discovered Smith by happenstance.  Vasquez continued to provide minimal security for Smith, and thus, was deliberately indifferent to Smith's welfare.

19

1    *Discussion*

2        The Court agrees with Defendants.  The evidence shows that Vasquez did not make the

3    decision to house Taylor with Smith.  See DUMF 71.  Therefore, Vasquez cannot be held liable

4    for that decision.  See James, 606 F.3d at 653 n.3.  The evidence also shows that the first time

5    Vasquez went to Smith and Taylor's cell, the attack of Smith was completed and Smith was lying

6    on the ground with his head covered.  See DUMF's 52, 55, 57.  When Vasquez saw this, he

7    caused a medical emergency alarm to be initiated.  See DUMF 56.  There is nothing to indicate

8    that Vasquez acted improperly once he reached Smith and Taylor's cell, nor is there anything to

9    indicate that Vasquez had a reasonable opportunity to stop Taylor during the attack on Smith.  Cf.

10   Cunningham v. Gates, 229 F.3d 1271, 1289 (9th Cir. 2000) (holding that officers are only liable

11   for failing to intercede to protect a suspect from constitutional violations by fellow officers when

12   there is a reasonable opportunity to do so).  Therefore, Vasquez cannot be held liable for failing to

13   aid Smith or failing to intercede.  See James, 606 F.3d at 653 n.3.

14       As for Vasquez's failure to perform a welfare check at the start of his shift, it appears that

15   Vasquez was following his assigned duties by taking inmates to the showers and delivering the

16   evening meals.[12]  See Vasequez Depo. 11:13-13:7, 22:5-21.  Plaintiffs cite no evidence that shows

17   Vasquez was constitutionally required to make a welfare check instead of performing other duties.

18   It is true that prison policy required guards to perform random welfare checks on the inmates.  See

19   DUMF 41.  However, the violation of a departmental regulation or policy alone does not establish

20   a constitutional violation.  Cousins, 568 F.3d at 1070; Case, 249 F.3d at 930.  Any failure to

21   follow the welfare check policy by Vasquez did not violate the Eighth Amendment.

22       Plaintiffs also emphasize Taylor's history of aggressive behavior towards other inmates.

23   However, Vasquez was not involved in the decision to house Smith and Taylor, and there is no

24   evidence that Vasquez ever reviewed either Smith or Taylor's Central Files.  Furthermore, there is

25   no evidence that Smith or Taylor ever complained about each other to Vasquez, that Vasquez had

26   viewed clearly hostile conduct between Smith and Taylor, or that Smith requested assistance from

27

28   ---
     [12] The Court notes that as part of the showering process, Vasquez would have been performing a de facto welfare
     check because he would have asked each inmate whether they wanted to shower that day.  See DUMF 51.

1   Vasquez regarding Taylor.  As such, Plaintiffs have failed to produce evidence that Vasquez

2   subjectively realized that Smith faced a substantial risk of serious harm from Taylor.  See Farmer,

3   511 U.S. at 837; Cortez, 776 F.3d at 1050.  In the absence of evidence that shows subjective

4   awareness of a substantial risk of serious danger, there is no deliberate indifference, and without

5   deliberate indifference, there can be no liability under the Eighth Amendment for failure to

6   protect.  See id.

7          Because Plaintiffs have not shown that Vasquez had subjective knowledge of a substantial

8   risk of serious harm to Smith by Taylor, or that Vasquez personally participated in

9   unconstitutional behavior, summary judgment in favor of Vasquez on all claims is appropriate.

10

11                                            **ORDER**

12          Accordingly, IT IS HEREBY ORDERED that:

13   1.    Defendants' motion for summary judgment with respect to the standing of Nicole Palmer

14          and Keshawn Winston is DENIED;

15   2.    Defendants' motion for summary judgment is otherwise GRANTED;

16   3.    The Clerk shall enter judgment in favor of Defendants and CLOSE this case; and

17   4.    All currently set dates and deadlines are VACATED.

18

19   IT IS SO ORDERED.

20   Dated:   August 17, 2015                    _____

21                                            SENIOR  DISTRICT  JUDGE

22

23

24

25

26

27

28